[Cite as *In re N.F.*, 2023-Ohio-566.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

IN RE:

    N.F.,

**CASE NO. 9-22-40**

[JESSICA F. - APPELLANT]
[JASON C. - APPELLANT]

**O P I N I O N**

Appeal from Marion County Common Pleas Court
Family Division
Trial Court No. 2019 AB 0021

**Judgment Affirmed and Appeal Dismissed in Part**

Date of Decision: February 27, 2023

APPEARANCES:

    *Taylor G. Vance* for Appellant, Jason C.

    *Geoffrey L. Stoll* for Appellant, Jessica F.

    *Lawrence H. Babich,* Guardian Ad. Litem

    *Charles R. Hall, Jr.* for Appellee

Case No. 9-22-40

**WALDICK, J.**

{¶1} Mother-appellant, Jessica F. ("Jessica"), and father-appellant, Jason C. ("Jason"), bring this appeal from the July 15, 2022, judgment of the Marion County Common Pleas Court, Family Division, granting permanent custody of N.F. to Marion County Children's Services ("MCCS"). On appeal, Jason argues that the trial court erred by determining that it was in N.F.'s best interests to grant MCCS's permanent custody motion, and that the trial court erred by finding that MCCS had made reasonable efforts to reunify the family. Jessica, filing a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), presents the proposed assignment of error that the trial court erred by failing to award legal custody of N.F. to Jason's relatives, Rickey and Cynthia Hodges ("the Hodges"). For the reasons that follow, we affirm the judgment of the trial court in Jason's case, and we dismiss Jessica's appeal.

*Background*

{¶2} Jason and Jessica are the parents of N.F., who was born in January of 2019. When he was born, N.F.'s meconium tested positive for THC, prompting MCCS to file a complaint alleging that N.F. was an abused and dependent child. MCCS also sought, and received, emergency temporary custody of N.F.

{¶3} Upon his release from the hospital, N.F. was placed in the physical custody of a foster family ("the Tacketts"). The Tacketts already had physical

custody of two of N.F.'s older siblings while those siblings' children's services cases were pending. Notably, N.F.'s older siblings were permanently removed from their parents' care and they were adopted by the Tacketts.

{¶4} On October 30, 2019, N.F. was adjudicated an abused and dependent child as alleged in the complaint. A dispositional hearing was held December 2, 2019, wherein N.F. was ordered to remain in the temporary custody of MCCS.[1]

{¶5} In the following months, N.F.'s parents attempted to comply with the case plan that was in place; however, as this case was pending, Jason was convicted of two counts of burglary. He was sentenced to 11 years in prison, with an expected release date in 2030.

{¶6} Meanwhile, Jessica initially made progress with several provisions of the case plan, such as completing parenting classes and remaining drug free. However, she was unable to maintain a stable, suitable residence and she was unable to maintain employment. Moreover, she was sporadic in exercising visitation with N.F., in part due to her own period of incarceration.

{¶7} In September of 2020, MCCS filed a motion for permanent custody of N.F. A hearing was held on the motion but the hearing concluded prior to completion in order to allow MCCS to explore additional kinship placements for N.F. Subsequently, third-party relatives of Jason, the Hodges, filed a motion to

---

[1] No appeal was taken from the trial court's February 10, 2020, judgment entry of disposition.

intervene in this case, as did Benjamin and Natalie Murphy ("the Murphys"). Both the Hodges and the Murphys were permitted to intervene.

{¶8} In February of 2022, MCCS refiled its motion for permanent custody of N.F. The Hodges and the Murphys also filed motions for legal custody of N.F.; however, the Murphys only requested legal custody of N.F. in the event that MCCS's motion for permanent custody was not granted.

{¶9} All pending motions were heard June 13-14, 2022.[2] At the hearing, testimony established that N.F. had been with the Tacketts since he was released from the hospital after his birth, over three years prior. By all indications N.F. was bonded to the Tacketts and his siblings in the household. In fact, the Tacketts indicated that they would seek adoption of N.F., just as they had with two of his older siblings. The GAL who had been appointed for N.F. recommended that permanent custody be granted to MCCS and the Murphys also testified that it was in N.F.'s best interest to remain with the Tacketts.

{¶10} As for the Hodges, testimony indicated that Cynthia Hodges was medically and legally blind, and that she had a prior child abuse case. Rickey Hodges had a prior conviction for domestic violence. Furthermore, the Hodges would be in their 80s by the time N.F. was a teenager.

---

[2] Jessica did not appear for the final hearing; however, her attorney was present.

{¶11} On July 15, 2022, the trial court filed its final judgment entry granting permanent custody of N.F. to MCCS. After conducting a thorough review of the record, the trial court determined, *inter alia*, that N.F. had been in MCCS's temporary custody for greater than twelve or more months of a consecutive twenty-two month period, that N.F. could not, and should not, be returned to either parent within a reasonable time, and that it was in N.F.'s best interests for MCCS to be granted permanent custody. The trial court also denied the motions for legal custody filed by the Hodges and the Murphys.

{¶12} Jason filed a timely appeal of the trial court's judgment, asserting the following assignments of error for our review.

**Jason's Assignment of Error No. 1**
**The trial court erred when it found by clear and convincing evidence granting the Agency permanent custody of the child is in the child's best interest.**

**Jason's Assignment of Error No. 2**
**The trial court erred in finding that the Agency made reasonable efforts to reunify the family.**

{¶13} Jessica also appealed the trial court's judgment; however, her attorney filed a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), asserting the following proposed assignment of error for our review.

**Jessica's Proposed Assignment of Error**
**The trial court erred by failing to award legal custody of the minor child to great uncle, Rickey Hodges, and great aunt, Cynthia Hodges, as an alternative to its award of permanent**

**custody of the minor child to Marion County Children[']s Services.**

{¶14} For ease of discussion, we will review Jason's appeal and his assignments of error before proceeding to Jessica's appeal.

*Jason's First Assignment of Error*

{¶15} In his first assignment of error, Jason argues that the trial court erred by determining that it was in N.F.'s best interests to grant MCCS's motion for permanent custody.

Standard of Review

{¶16} In a permanent-custody case, the ultimate question for a reviewing court is "whether the * * * court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 43. "Clear and convincing evidence" is the " 'measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.' " *In re Dn.R.* 3d Dist. Shelby No. 17-20-06, 2020-Ohio-6794, ¶ 17, quoting *In re Estate of Haynes*, 25 Ohio St.3d 101, 104 (1986).

{¶17} "In determining whether a trial court based its decision upon clear and convincing evidence, 'a reviewing court will examine the record to determine

whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.' " *Id.* at ¶ 18, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990). "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M.*, 4th Dist. Athens Nos. 12CA43 and 12CA44, 2013-Ohio-3588, ¶ 55.

Controlling Authority

{¶18} Revised Code 2151.414(B)(1) "establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody: (1) the trial court must find that one of the circumstances in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) the trial court must find that permanent custody is in the best interest of the child." *In re Y.W.*, 3d Dist. Allen No. 1-16-60, 2017-Ohio-4218, ¶ 10.

{¶19} The first prong of the test requires a finding by clear and convincing evidence that one of the statutorily-prescribed situations of R.C. 2151.414(B)(1) is satisfied. As relevant to this case, R.C. 2151.414(B)(1) provides:

> **[T]he court may grant permanent custody of a child to a movant if the court determines at a hearing held pursuant to [R.C. 2151.414(A)], by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**

**(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**

**\* \* \***

**(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or months of a consecutive twenty-two month period \* \* \*.**

R.C. 2151.414(B)(1)(d).

**{¶20}** "If the trial court determines *any* provision enumerated in R.C. 2151.414(B)(1) applies," it must proceed to the second prong of the test, which requires the trial court to "determine, by clear and convincing evidence, whether granting the agency permanent custody of the child is in the child's best interest." (Emphasis sic.) *In re A.F.*, 3d Dist. Marion No. 9-11-27, 2012-Ohio-1137, ¶ 55; *see* R.C. 2151.414(B)(1). The best interest determination in the second prong of the permanent custody test is based on an analysis of R.C. 2151.414(D).

**{¶21}** Under R.C. 2151.414(D)(1), the trial court is required to consider all relevant factors listed in that subsection, as well as any other relevant factors. *In re*

Case No. 9-22-40

*H.M.*, 3d Dist. Logan Nos. 8-13-11, 8-13-12, 8-13-13, 2014-Ohio-755, ¶ 27. The

factors of R.C. 2151.414(D)(1) include:

> **(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**
>
> **(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**
>
> **(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;**
>
> **(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**
>
> **(e) Whether any of the factors in [R.C. 2151.414(E)(7)-(11)] apply in relation to the parents and child.**

R.C. 2151.414(D)(1).

Analysis

**{¶22}** At the outset, we emphasize that neither parent has challenged the trial

court's determination with regard to the first prong of the permanent custody test,

which concerns whether one of the provisions of R.C. 2151.414(B)(1) was present

here. Even if either parent did challenge the trial court's findings, the trial court

-9-

found that *both* R.C. 2151.414(B)(1)(a) and R.C. 2151.414(B)(1)(d) were applicable in this case, and those determinations are supported by the record.[3]

{¶23} We turn then to address the second prong of the permanent custody test, which concerns whether granting MCCS's motion for permanent custody was in N.F.'s best interests, utilizing the guiding factors in R.C. 2151.414(D)(1).

{¶24} First and foremost, N.F. had been in the physical custody of the Tacketts since he was released from the hospital after his birth, over three years prior to the permanent custody hearing. He was strongly in need of a legally secure placement given the exorbitant amount of time his case had been pending. R.C. 2151.414(D)(1)(c)/(d).

{¶25} Second, when looking at R.C. 2151.414(D)(1)(a) and N.F.'s relationships, the testimony of the MCCS caseworkers, the Tacketts, and even the Murphys, who had filed for legal custody in the event that permanent custody was not granted to MCCS, all indicated that N.F. was fully bonded to the Tacketts, that N.F. saw the Tacketts as his family and that N.F. was fully integrated into the Tackett's home. In fact, the Murphys actually felt that removal of N.F. from the Tacketts home might be "traumatic" for N.F. given that the Tacketts were the only family N.F. had ever known.

---

[3] It is readily apparent that N.F. had been in the temporary custody of MCCS for twelve or more months of a consecutive twenty-two-month period given that he had been in MCCS's temporary custody for over three years.

{¶26} Moreover, we would emphasize that the Tacketts were meeting N.F.'s special needs. N.F. was born deaf and he had a cochlear implant before his first birthday. The Tacketts and their children had learned basic sign language and used it around the house to communicate with N.F. In addition, the Tacketts were taking N.F. to numerous speech and audiology appointments and N.F. was progressing in both areas.

{¶27} By contrast to the Tacketts, testimony established that Jessica had, at best, a strained and inconsistent relationship with N.F. For example, Jessica actually refused to believe that N.F. was born deaf, and during one visitation she pulled his cochlear implants out of his ears and damaged them. Further, at the time of the permanent custody hearing, Jessica had not exercised visitation with N.F. in approximately eight months. She was not present at the final hearing and her attorney did not know how to locate her.

{¶28} As to Jason's relationship with N.F., Jason did not have much interaction with N.F. due to his lengthy incarceration. Testimony indicated that Jason's relationship with N.F. was not likely to change in the near future given that Jason would not even be *eligible* for judicial release until 2025 at the earliest, and he was not scheduled for release until 2030.

{¶29} As to a consideration of N.F.'s wishes pursuant to R.C. 2151.414(D)(1)(b), the GAL wrote a lengthy report in this case recommending that

permanent custody be granted to MCCS. The GAL detailed his involvement and his investigation throughout the pendency of this case, and he also expressed his concerns about removing N.F. from the Tacketts home, where N.F. was, by all accounts, doing very well.

**{¶30}** Aside from the factors cited above, the Ohio Revised Code provides additional factors for a court to consider when evaluating permanent custody motions, such as whether the parents have had their rights involuntarily terminated with respect to siblings of the child at issue and whether the parent was incarcerated at the time of the filing of the permanent custody motion. R.C. 2151.414(E)(11), (12). Here, both Jason and Jessica had their rights involuntarily terminated with respect to other children *and* Jason was also incarcerated at the time of the permanent custody hearing. These factors support the trial court's determination.

**{¶31}** In sum, the trial court took all of the evidence into account, analyzed the appropriate statutory factors, and filed a thorough judgment entry determining that it was in N.F.'s best interests to grant MCCS's permanent custody motion. After reviewing the record, we do not find that the trial court erred in this matter. Therefore, Jason's first assignment of error is overruled.

*Jason's Second Assignment of Error*

**{¶32}** In Jason's second assignment of error, he argues that the trial court erred by finding that MCCS made reasonable efforts to reunify the family.

Relevant Authority

{¶33} The Ohio Revised Code imposes a duty on the part of children's services agencies to make reasonable efforts to reunite parents with their children when the agency has removed the children from the home. *In re J.D.*, 3d Dist. Hancock No. 5-10-34, 2011-Ohio-1458, ¶ 14, citing R.C. 2151.419. To that end, case plans establish individualized concerns and goals, along with the steps that the parties and the agency can take to achieve reunification. *Id.*

{¶34} Agencies have an affirmative duty to diligently pursue efforts to achieve the goals in the case plan. *Id.* "Nevertheless, [when considering reasonable efforts,] the issue is not whether there was anything more that [the agency] could have done, but whether the [agency's] case planning and efforts were reasonable and diligent under the circumstances of this case." *In re Leveck,* 3d Dist. Hancock Nos. 5–02–52, 5–02–53, 5–02–54, 2003–Ohio–1269, ¶ 10.

Analysis

{¶35} Although Jason contends that the trial court erred by finding that MCCS had engaged in reasonable efforts in this case, the trial court had previously determined that MCCS engaged in reasonable efforts to reunify the family at N.F.'s disposition and that determination was not appealed by Jason or Jessica. Generally, a children's services agency is required to demonstrate reasonable efforts prior to

Case No. 9-22-40

filing a permanent custody motion[4], not at the permanent custody hearing, *unless it has failed to do so previously*. *In re S.S.*, 4th Dist. Jackson Nos. 16CA7, 16CA8, 2017-Ohio-2938, ¶ 166-169. "Because the trial court entered a reasonable efforts finding before placing the children in the agency's permanent custody," it was not required to do so again. *See id.* at ¶ 173.

**{¶36}** Nevertheless, in the interests of justice we will review Jason's argument that MCCS did not engage in reasonable efforts to support reunification in this case, particularly since the trial court's final entry analyzed the issue of reasonable efforts. In its entry, the trial court determined that

> **[MCCS] has made reasonable efforts to prevent [N.F.]'s removal from his parents' home, eliminate his continued removal from their home, and has taken steps for [N.F.] to return safely home, but his parent[s'] failure to cooperate and work with [MCCS] in achieving the Case Plan goals and objectives has prevented this from occurring and this does not appear possible in the foreseeable future.**

(Doc. No. 183).

**{¶37}** Jason argues that the trial court's determination was erroneous, contending that MCCS failed to adequately assist Jessica in acquiring stable housing.[5] He also contends that MCCS did not adequately investigate other potential relative placements.

---

[4] R.C. 2151.413(D)(3)(b).

[5] Generally, when an appellant is complaining of errors related to another party, the appellant has to show that *he* was directly prejudiced by the error to establish standing. *See In re Leo D.*, 6th Dist. Lucas No. L-01-1452, at footnote 2.

{¶38} Contrary to Jason's argument that MCCS failed to adequately assist Jessica, MCCS often could not locate Jessica and Jessica did not maintain regular contact with MCCS. Moreover, during part of the case, Jessica was incarcerated, then, later, as the permanent custody motion was pending, Jessica stopped working the case plan altogether and she stopped exercising visitation with N.F.

{¶39} As to Jason's claim that MCCS did not adequately investigate other relative placements, MCCS looked into the Murphys and the Hodges and any other relatives that were presented by Jason and Jessica. The fact that some placements were not a viable option does not reflect any failure on the part of MCCS to engage in reasonable efforts in this case.

{¶40} After reviewing the record and the facts contained therein, we do not find that the trial court erred by determining that MCCS engaged in reasonable efforts to support reunification in this matter either prior to the permanent custody hearing or at the permanent custody hearing. Therefore, Jason's second assignment of error is overruled.

*The Anders Appeal Relating to Jessica*

{¶41} Counsel appointed to prosecute Jessica's appeal filed a motion requesting that he be granted leave of court to withdraw as appellate counsel, pursuant to the guidelines established in *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396 (1967). Counsel indicated in both his motion and the brief that he reviewed

the record and can find no prejudicial error in the trial court proceedings upon which to base meritorious issues for appeal. Appellate counsel requests permission to withdraw on the basis that the appeal is without merit and wholly frivolous.

**{¶42}** In the *Anders* brief, appointed appellate counsel refers to one issue of potential error for review: whether the trial court erred by failing to award legal custody of N.F. to the Hodges as an alternative to permanent custody.

**{¶43}** The record establishes that the Hodges' motion for legal custody was fully litigated at the final hearing. Testimony indicated that both of the Hodges were nearing 70 years old and that they had health problems, particularly with Cynthia being legally blind. This concerned the trial court given that N.F. had special needs and was using some sign language. Moreover, testimony indicated that Cynthia had previously abused a child—though she denied this fact at the final hearing—and that Rickey had a prior conviction for domestic violence.

**{¶44}** However, the trial court noted in its final entry that the Hodges had a safe and stable home and that it was clear that they would do their utmost to care for N.F. if they were granted legal custody. Nevertheless, the trial court determined that it would be traumatic for N.F. to be removed from the only family he had ever known. Combining this with the prior stated facts, we cannot find that the trial court erred by denying the Hodges' motion for legal custody of N.F.

{¶45} Accordingly, we find no "arguable" error in the trial court's determination that it was in N.F.'s best interest for MCCS to be granted permanent custody. Therefore, we agree with counsel's conclusion that there are no arguable issues in this matter. *See Penson v. Ohio*, 488 U.S. 75, 80 (1988). Consequently, Jessica's appointed counsel's motion to withdraw is well-taken.

*Conclusion*

{¶46} Based on our examination of the record, Jason's assignments of error are overruled and the judgment of the Marion County Common Pleas Court is affirmed. Having further reviewed the entire record and having found that no arguably meritorious issues exist, we conclude that Jessica's appeal is wholly frivolous under *Anders* and dismiss her appeal.

***Judgment Affirmed and***
***Appeal Dismissed in Part***

**MILLER, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**